**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE BUMBLE INC. STOCKHOLDER DERIVATIVE LITIGATION | Master File No. Case No.: 1:22-cv-01070-MN |
| | (Consolidated with No. 1:23-cv-00558-MN) |
| This Document Relates To: | **DEMAND FOR JURY TRIAL** |
| | **PUBLIC VERSION** |
| ALL ACTIONS | |

**VERIFIED FIRST AMENDED CONSOLIDATED**
**STOCKHOLDER DERIVATIVE COMPLAINT**

Marilee C. Glover-Mott and Michael Schirano ("Plaintiffs"), by and through undersigned counsel, bring this stockholder derivative action in the name and on behalf of nominal defendant Bumble Inc. ("Bumble" or the "Company"), for breaches of fiduciary duties and other violations of law against the Defendants: (a) the Company's controlling stockholder, Blackstone, Inc., and its affiliates, Blackstone Group Management L.L.C., BXG Buzz Holdings L.P., BX Buzz ML-1 Holdco L.P., BX Buzz ML-1 GP LLC, BXG Holdings Manager L.L.C., Blackstone Growth Associates L.P. BXGA L.L.C., BCP Buzz Holdings L.P., BX Buzz ML-2 Holdco L.P., Bx Buzz ML-2 GP LLC, BCP VII Holdings Manager-NQ L.L.C., Blackstone Management Associates VII NQ L.L.C., BMA VII NQ L.L.C., BSOF Buzz Aggregator L.L.C., BX Buzz ML-3 Holdco L.P., BX Buzz ML-3 GP LLC, Blackstone Strategic Opportunity Associates L.L.C., Blackstone Holdings II L.P., Blackstone Holdings I/II GP L.L.C., BTO Buzz Holdings II L.P., Bx Buzz ML-4 Holdco L.P., BX Buzz ML-4 GP LLC, BTO Holdings Manager L.L.C., Blackstone Tactical Opportunities Associates L.L.C., BTOA L.L.C., Blackstone Holdings III L.P., Blackstone Holdings III GP L.P., Blackstone Holdings III GP Management L.L.C., Blackstone Buzz Holdings L.P., BX Buzz ML-5 Holdco L.P., Bx Buzz

ML-5 GP LLC, BTO Holdings Manager-NQ L.L.C., Blackstone Tactical Opportunities Associates-NQ L.L.C., BTOA-NQ L.L.C., Blackstone Tactical Opportunities Fund-FD L.P., BX Buzz ML-6 Holdco L.P., BX Buzz ML-6 GP LLC, Blackstone Tactical Opportunities III-NQ L.P., BTO DE GP-NQ L.L.C., Blackstone Family Investment Partnership-Growth Esc L.P., BX Buzz ML-7 Holdco L.P., BXG Side-By-Side GP L.L.C, (collectively, "Blackstone"); and (b) the current and former directors and/or officers of the Company, in their representative capacities, Whitney Wolfe Herd ("Herd"), Anuradha B. Subramanian ("Subramanian"), Ann Mather ("Mather"), Christine L. Anderson ("Anderson"), R. Lynn Atchison ("Atchison"), Sachin J. Bavishi ("Bavishi"), Matthew S. Bromberg ("Bromberg"), Amy M. Griffin ("Griffin"), Jonathan C. Korngold ("Korngold"), Jennifer B. Morgan ("Morgan"), Elisa A. Steele ("Steele"), and Pamela A. Thomas-Graham ("Thomas-Graham"). Plaintiffs base their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based upon due investigation by counsel, including: (a) documents and other information obtained from the Company pursuant to 8 *Del. C.* §220 ("Section 220"); (b) review and analysis of public filings made by Bumble and other persons with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (d) review of news articles, stockholder communications, and postings concerning the Company's public statements; (e) review and analyses of complaints and other related materials in litigation commenced by and/or against the Company and/or its affiliates, (f) related lawsuits alleging violations of federal securities law based on similar facts and circumstances detailed herein, including the securities class action that was brought in the United States District Court for the Southern District of New York captioned *UA Local 13 Pension Fund v, Bumble Inc., et. al.*, Case No. 1:22-cv-00624 (the "Securities Class Action"); and (g) review of other publicly available information concerning the Company,

1

Defendants, and other relevant persons.

## INTRODUCTION & OVERVIEW

1.     This is a stockholder derivative action brought by Plaintiffs, stockholders of the Company, on behalf of Bumble, against the Defendants and seeking to remedy their violations of federal and Delaware law, and harm resulting therefrom, including damages to the Company's reputation and goodwill, when Defendants caused, approved, and/or acquiesced to the Company's issuance of false and misleading public statements in connection with the Company's September 9, 2021 Secondary Public Offering ("SPO"), thereby allowing the sale of Blackstone's shares at artificially inflated prices to the detriment of Bumble, whose share price fell precipitously thereafter when the public finally received the information Blackstone knew prior to the SPO. This derivative action also seeks to remedy violations of federal and Delaware law, and harm resulting therefrom, including damages to the Company's reputation and goodwill, when Defendants caused, approved, and/or acquiesced to the Company's issuance of false and misleading public statements in connection with the Company's 2022 Proxy Statement, filed with the SEC on April 22, 2022 (the "2022 Proxy Statement"), thereby allowing a portion of the directors responsible for approving the SPO and issuing the false and misleading statements pursuant thereof to remain directors of the Company.  Further, this derivative action seeks to remedy violations of federal and Delaware law, and harm resulting therefrom, including damages to the Company's reputation and goodwill, when Defendants caused, approved, and/or acquiesced to the Company's repurchase of millions of dollars-worth of its own stock while the stock price remained at least partially artificially inflated due to the continued concealment of the full extent of the wrongdoing alleged herein. Finally, this derivative action seeks to rescind the Defendants' compensation agreements with the Company and/or claw back compensation that the Defendants earned while they were violating the federal securities laws and/or breaching their fiduciary duties.

2.      Bumble is formerly a private company which owns and operates two well-known online dating applications: Bumble (the "Bumble App") and Badoo (the Badoo App"). In late 2020, Blackstone purchased a multi-billion-dollar stake in the Company from an initial investor.

3.      As the Company stated in its Annual Report on Form 10-K for the fiscal year ending December 31, 2020 ("FY20 10-K"), dated March 15, 2021, the Bumble and Badoo Apps "monetize via a freemium model where the use of our service is free and a subset of our users pay for subscriptions or in-app purchases to access premium features." As such, Bumble recognized "[i]f we fail to retain existing users or add new users, or if our users … to not convert to paying users, our revenue, financial results and business may be significantly harmed."

4.      Bumble's FY20 10-K also acknowledges that if third party payment platforms such the Google Play Store, which is owned and operated by Alphabet Inc. ("Google"), "adopt and enforce policies that limit, prohibit or eliminate our ability to distribute or update our applications through their stores, or increase the costs to do so, it could materially adversely affect our business, financial condition and results of operations."

5.      At least every month, the Company tracked the key metric of how many regular and paying users subscribed to its Bumble and Badoo Apps and used the information to calculate metrics such as revenue per paying user and monthly active users. Bumble regularly shared this information with Blackstone pursuant to agreements executed in connection with Bumble's initial public offering ("IPO").

6.      Namely, Blackstone controls Bumble as a majority stockholder with Herd, its founder and Chief Executive Officer ("CEO"). In February 2021, pursuant to Blackstone's purchase of a large stake therein a few months prior, Bumble went public through a successful IPO, raising more than $2.47 billion on the sale of 57.5 million shares at $43 each. Bumble's IPO

Prospectus, filed with the SEC on February 12, 2021, advertised Bumble's growth in paying users from 2019 to 2020. It also disclosed Herd and Blackstone controlled enough voting power in Bumble that NASDAQ governance standards considered it a "controlled company," exempting it from several requirements such as the independence of its board of directors.

7.      Also pursuant to the IPO, Bumble and Blackstone entered into a Stockholders Agreement and Registration Rights Agreement that further emphasized and cemented Bumble's lack of independence from Blackstone. According to such agreements, Bumble was required to deliver periodic reports to Blackstone regarding its operations, budgets, and cash flows. Blackstone also had the right to request a review of Bumble's books and records and discuss the same with Bumble's officers. Blackstone further could force Bumble to call a registered offering, like the SPO, at the Company's expense to facilitate the sale of Blackstone's shares. If Bumble called such an offering, Blackstone could elect to review and comment on the offering materials and select the managing underwriters and advisory services.

8.      Following its IPO, Bumble claimed it was experiencing significant growth in its paying user count for the first and second quarters of 2021, ending June 30, 2021.

9.      However, unbeknownst to the investing public, Bumble's previously rosy paying user and revenue growth trends had abruptly reversed in the beginning of the third quarter of 2021 ("3Q21"), ending September 30, 2021, and Bumble still ████████████████████████ ██████████████████ regarding the rollout of ████████████████████████ ████████████████████.

10.      For example, the Badoo App's ████████████████████ prior to the end of 3Q21, which the Company internally attributed to a ████████████████████████

along with ████████████████████████████ and ████████████████████████████

████████████████████████

11.     As for the Bumble App, paying user growth slowed significantly, missing consensus estimates.

12.     According to allegations in the Securities Class Action, Bumble's employees also discussed the declining growth of the Bumble and Badoo Apps with key executives and discussed those trends frequently in extremely uncomplimentary terms.

13.     Because Blackstone had access to confidential information regarding Bumble's poor performance metrics, it chose to exercise its rights to force the Company to undertake the SPO mere days before the end of 3Q21.

14.     Before the SPO's close on September 15, 2021, the Company sold 20.7 million shares, all owned by Blackstone, to the unsuspecting public for $54 per share; Blackstone pocketed $1.1 billion in proceeds and, pursuant to the appointment of its own affiliate as one of the SPO's underwriters, some portion of the $33.5 million in fees Bumble paid the SPO's underwriters.

15.     Bumble's SEC filings prior to the SPO—such as its Registration Statement and Prospectus, filed on September 7 and 13, 2021, respectively—concealed the truth about the performance of the Badoo and Bumble Apps by using outdated figures from the second quarter of 2021 ("2Q21"), which ended June 30, 2021, showing its paying user base had increased 25% year-over-year. Bumble also explicitly represented that it "expect[ed] to increase paying users and average revenue per paying user," which was ████████████████████████

████████████████████ showing ████████████████████████████

████████████████████████████████████████

throughout the end of FY2021 and into FY2022.

16.    On November 10, 2021, less than a month after Blackstone sold its shares for inflated prices in the SPO, Bumble publicly announced what Defendants had known all along—the Company's total paying users across both Apps had declined from 2.9 million at the end of 2Q21 to 2.86 million at the end of 3Q21.

17.    The full extent of Defendants' wrongdoing, however, was not, and has never been, disclosed to the public. Among other things, as detailed herein, the Company's confidential internal books and records obtained pursuant to Section 220 evidence the Board's knowledge of and involvement in the false and misleading statements that fueled the SPO for the benefit of Blackstone.

18.    Over the next two trading days, Bumble's share price dropped 28% from its closing price prior to the announcement of its 3Q21 results; Blackstone thereby received approximately $308 million more by selling its shares in the SPO than if it had sold them after Bumble's 3Q21 results were publicly known. Market analysts focused heavily on Bumble's poor performance caused by the Apps' users' decreasing likelihood to pay for the services.

19.    As of closing on April 5, 2023, Bumble's shares sold for $18.62, a 65.52% decrease since the SPO. For illustration purposes, Match.com, Bumble's biggest competitor, only suffered a 37.76% decrease in the price of its shares during the same period.

20.    Moreover, while the Company's stock price remained at least partially artificially inflated due to the continued concealment of the full extent of Defendants' wrongdoing, on May 4, 2023, the Company issued a press release announcing that the Board had approved a share repurchase program of up to $150 million of Bumble's outstanding Class A common stock. Pursuant to this Board-approved program, during the second quarter of 2023 Bumble repurchased

more than 1.3 million shares of its Class A common stock for approximately $20.9 million, a price significantly above the stock's actual value.

21.     As a direct and proximate result of Defendants' breaches of fiduciary duties and other misconduct, Bumble has sustained damages as described below.

22.     Plaintiffs did not make a demand on the Board to institute this litigation because doing so would be a futile and useless act. At the time of the filing of the original operative complaint in this consolidated action, the Board comprised the following eleven individuals: Director Defendants (defined herein) Herd, Mather, Anderson, Atchison, Bavishi, Bromberg, Griffin, Korngold, Morgan, Steele, and Thomas-Graham (the "Demand Board"). As explained herein, all of these Defendants face a substantial likelihood of liability in this action for breaching their fiduciary duties by making false and misleading statements in the Company's SEC filings in advance of the SPO and, in violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), in the 2022 Proxy Statement, and by causing the Company to repurchase millions of dollars-worth of its own stock while the stock price remained at least partially artificially inflated in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Moreover, demand is futile because there is reason to doubt that all of the Director Defendants are independent from Defendant Blackstone—Bumble's controlling stockholder, which also faces a substantial likelihood of liability in this action for, among other things, expropriating Bumble's inside information to reap more than $1 billion in ill-gotten proceeds— because they are beholden to Blackstone for their continued lucrative employment at Bumble and/or their prior and current generous business deals with Blackstone and the prospect of more business deals with Blackstone in the future. Accordingly, demand should be excused as futile, and Plaintiffs should be permitted to prosecute this action on behalf of Bumble.

**JURISDICTION & VENUE**

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question by arising pursuant to Sections 10(b), 14(a), and 29(b) of the Exchange Act, 15 U.S.C. §§ 78(j)(b), 78n, 78cc.

24.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on this Court it would not otherwise have.

26.     This Court has personal jurisdiction over each Defendant because they are either a corporation incorporated herein, or he or she is an individual with sufficient minimum contacts hereto to justify the exercise of this Court's jurisdiction thereupon.

27.     Venue is proper in this District pursuant 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, the Defendants have received substantial compensation herein by transacting business in this District, and Bumble's Amended and Restated Certificate of Incorporation includes a forum selection clause designating federal district courts as the exclusive forum for the resolution of causes of action arising under federal securities laws.

**PARTIES**

28.     Plaintiff Glover-Mott is a current Bumble stockholder and has continuously held the same since July 19, 2021 and at all relevant times.

29.     Plaintiff Schirano is a current Bumble stockholder and has continuously held the same since February 11, 2021 and at all relevant times.

30.     Nominal Defendant Bumble Inc. operates online dating platforms internationally. While its Bumble App is popular in the United States, its Badoo App operates primarily in Europe and Latin America. Bumble is a Delaware corporation founded in 2014 and is headquartered at

1105 West 41st Street in Austin, Texas. Bumble common stock is traded on the NASDAQ under the symbol "BMBL." As of December 31, 2022, Bumble had more than 950 full-time employees.

## A.    BLACKSTONE DEFENDANTS

31.    Defendant Blackstone Inc. is a Delaware corporation with principal executive offices at 345 Park Avenue in New York, New York. It and its affiliates, identified *infra*, typically invest in early-stage companies or provide capital market services. At the time of the SPO, Blackstone controlled Bumble.[1] As of April 2022, Blackstone beneficially owned 43,181,192 Class A Bumble stock and 34,356,242 common units of Bumble shares for a combined total voting power of 70.2%.[2] Its affiliates are as follows:

A.    Defendant Blackstone Group Management L.L.C. is the sole holder of Company stock owned by Blackstone Inc.; it is wholly owned by Blackstone Inc.'s senior managing directors and controlled by its founder and CEO, Stephen A. Schwarzman ("Schwarzman").

B.    Defendant BXG Buzz Holdings L.P. is a party to the Stockholders Agreement and Registration Rights Agreement; it thus had the right to access non-public Bumble information prior to the SPO. It is the sole limited partner of BX Buzz ML-1 Holdco L.P., which sold 502,014 shares during the SPO. Defendant BXG Buzz Holdings

---

[1]    Further, Defendant Blackstone Inc. is affiliated with Blackstone Securities Partners L.P., which served as the underwriter for Bumble's SPO. Bumble was forced to disclose Blackstone Securities Partners L.P. had a "conflict of interest under Financial Industry Regulatory Authority, Inc. ("FINRA") Rule 5121" because "its affiliates own in excess of 10% of [Bumble's] outstanding Class A common stock." Bumble paid it, along with the other underwriters for the SPO, more than $33.5 million in fees for its services.

[2]    According to Bumble's 2022 Proxy Statement, "Class A stock" and "common units" are effectively the same, with the exception Class A stock ceased to be sold as such subsequent to Bumble's IPO, when it was thereafter sold as "common units." Thereby, those who hold Class A stock are marked as initial investors in the Company prior to its public offering.

L.P. is also the sole member of BX Buzz ML-1 GP LLC, which is also the general partner of BX Buzz ML-1 Holdco L.P. BXG Holdings Manager L.L.C., whose managing member is Blackstone Growth Associates L.P., which is a general partner of BXGA L.L.C, is also the general partner of Defendant BXG Buzz Holdings L.P.

C.    Defendant BCP Buzz Holdings L.P. is a party to the Stockholders Agreement and Registration Rights Agreement; it thus had the right to access non-public Bumble information prior to the SPO. It is the sole limited partner of BX Buzz ML-2 Holdco L.P., which sold 6,907,443 shares during the SPO. Defendant BCP Buzz Holdings L.P. is also the sole member of BX Buzz ML-2 GP LLC, which is also the general partner of BX Buzz ML-2 Holdco L.P. BCP VII Holdings Manager-NQ L.L.C., whose managing member is Blackstone Management Associates VII NQ L.L.C., which is a general partner of BMA VII NQ L.L.C., is also the general partner of Defendant BCP Buzz Holdings L.P.

D.    Defendant BSOF Buzz Aggregator L.L.C. is a party to the Stockholders Agreement and Registration Rights Agreement; it thus had the right to access non-public Bumble information prior to the SPO. It is the sole limited partner of BX Buzz ML-3 Holdco L.P., which sold 1,121,365 shares during the SPO. Defendant BSOF Buzz Aggregator L.L.C. is also the sole member of BX Buzz ML-3 GP LLC, which is also a general partner of BX Buzz ML-3 Holdco L.P. Defendant BSOF Buzz Aggregator L.L.C.'s managing member is Blackstone Strategic Opportunity Associates L.L.C., whose sole member is Blackstone Holdings II L.P.,[3] whose general partner is Blackstone Holdings I/II GP L.L.C., which is the sole member of Blackstone Inc.

---

[3]    Blackstone Holdings II L.P. is also the sole member of Blackstone Tactical Opportunities Associates L.L.C. and the managing member of Blackstone Tactical Opportunities Associates-NQ L.L.C., BTO DE GP-NQ L.L.C., BXGA L.L.C., and BMA VII NQ L.L.C., identified *infra*.

E.      Defendant BTO Buzz Holdings II L.P. is a party to the Stockholders Agreement and Registration Rights Agreement; it thus had the right to access non-public Bumble information prior to the SPO. It is the sole limited partner of BX Buzz ML-4 Holdco L.P., which sold 2,992,267 shares during the SPO. Defendant BTO Buzz Holdings II L.P. is also the sole member of BX Buzz ML-4 GP LLC, which is also a general partner of BX Buzz ML-4 Holdco L.P. Defendant BTO Buzz Holdings II L.P.'s general partner is BTO Holdings Manager L.L.C., whose managing member is Blackstone Tactical Opportunities Associates L.L.C., whose managing member is BTOA L.L.C., whose managing member is Blackstone Holdings III L.P., whose general partner is Blackstone Holdings III GP L.P., whose general partner is Blackstone Holdings III GP Management L.L.C.

F.      Defendant Blackstone Buzz Holdings L.P. is a party to the Stockholders Agreement and Registration Rights Agreement;[4] it thus had the right to access non-public Bumble information prior to the SPO. It is the sole limited partner of BX Buzz ML-5 Holdco L.P., which sold 9,077,161 shares during the SPO. Defendant Blackstone Buzz Holdings L.P. is also the sole member of BX Buzz ML-5 GP LLC, which is also a general partner of BX Buzz ML-5 Holdco L.P. Defendant Blackstone Buzz Holdings L.P.'s general partner is BTO Holdings Manager-NQ L.L.C., whose managing member is Blackstone Tactical Opportunities Associates-NQ L.L.C., whose managing member is BTOA-NQ L.L.C.

G.      Defendant Blackstone Tactical Opportunities Fund-FD L.P. is a party to the

---

[4]      Defendant Blackstone Buzz Holdings L.P. is also a party to a Support and Services Agreement with Bumble, as further detailed *infra*, which provided Blackstone the ability to directly access Bumble's internal metrics and data analysis.

Stockholders Agreement and Registration Rights Agreement; it thus had the right to access non-public Bumble information prior to the SPO. It is the sole limited partner of BX Buzz ML-6 Holdco L.P., which sold 81,871 shares during the SPO. Defendant Blackstone Tactical Opportunities Fund-FD L.P. is also the sole member of BX Buzz ML-6 GP LLC, which is also a general partner of BX Buzz ML-6 Holdco L.P. Defendant Blackstone Tactical Opportunities Fund-FD L.P.'s general partner is Blackstone Tactical Opportunities Associates III-NQ L.P., whose general partner is BTO DE GP-NQ L.L.C.

H.    Defendant Blackstone Family Investment Partnership-Growth ESC L.P. is a party to the Stockholders Agreement and Registration Rights Agreement; it thus had the right to access non-public Bumble information prior to the SPO. It is the sole limited partner of BX Buzz ML-7 Holdco L.P., which sold 17,879 shares during the SPO. Defendant Blackstone Family Investment Partnership-Growth ESC L.P. is also the sole member of BX Buzz ML-7 GP LLC, which is also a general partner of BX Buzz ML-7 Holdco L.P. Defendant Blackstone Tactical Opportunities Fund-FD L.P.'s general partner is BXG Side-by-Side GP L.L.C.

**B.    INDIVIDUAL DEFENDANTS**

32.    Defendant Anuradha B. Subramanian ("Subramanian") was the Chief Financial Officer ("CFO") of Bumble at the time of the SPO. Pursuant to Subramanian's August 14, 2020 employment agreement with Bumble Trading LLC, as amended from time to time, and the Company's equity, non-equity, and other compensation plans, in 2020, 2021, and 2022, she received total compensation from Bumble of $4,417,467, $827,125, and $6,773,641, respectively. As of April 2022, Subramanian beneficially owned 35,317 common units of Bumble shares.

33.    Defendant Whitney Wolfe Herd has been Bumble's Founder and CEO since

September 2014 and a member of Bumble's Board of Directors (the "Board") since January 2020. Due to her beneficial stockholdings and the Shareholder Agreement, she, along with Blackstone, was a controlling stockholder of Bumble at the time of the SPO by virtue of her combined 18.8% voting power over Bumble. Together with Blackstone, they controlled 94.9% of the combined voting power of Bumble prior to the SPO. Pursuant to Herd's January 29, 2020 employment agreement with Buzz Holdings, L.P. (of which the Company is the general partner) and the Company's equity, non-equity, and other compensation plans, in 2020, 2021, and 2022, she received total compensation from Bumble of $19,687,045, $1,125,200, and $16,234,030, respectively. In January 2020, prior to Bumble's IPO, Blackstone paid Herd $125 million in cash and also caused Bumble to loan Beehive Holdings III, LP, a Delaware limited partnership controlled by Herd, $119 million on generous interest terms of less than 2% with no repayment period. Blackstone later allowed Herd to pay off the loan with $25.6 million and a substantial portion of Beehive Holdings III LP's common shares. In connection with Bumble's IPO, Herd launched into the rarefied club of female billionaires (women account for less than 5% of the world's 500 biggest fortunes, according to the Bloomberg Billionaires Index), became the world's youngest self-made woman billionaire, and the youngest female CEO to take a company public, all of which would not have happened without Blackstone's help. Blackstone has also invited her in the past to participate in Blackstone-led investments in Spanx, Inc. and Supergoop! alongside Defendant Griffin. As of April 2022, Herd beneficially owned 604,650 Class A Bumble stock and 25,000,817 common units of Bumble shares for a combined total voting power of 22%.

34.     Defendant Ann Mather ("Mather") served as the Chair of the Board at the time of the SPO. She is also the Chair of the Board's Nominating and Corporate Governance Committee (the "Governance Committee"). Pursuant to the Company's equity, non-equity, and other

compensation plans, in 2021 and 2022, she received total compensation from Bumble of $300,000 and $1,319,558, respectively. As of April 2022, Mather beneficially owned 52,197 common units of Bumble shares.

35.    Defendant Christine L. Anderson ("Anderson") served as a member of Bumble's Board from August 2020 until June 6, 2023. At Blackstone, she has been Senior Managing Director and the Global Head of Public Affairs and Marketing since March 2009. She was selected by Blackstone to be a Board member of the Company.  In April 2023, she announced she would not stand for re-election to Bumble's Board.  Accordingly, her term as a director expired as of the Company's annual meeting of stockholders on June 6, 2023.

36.    Defendant R. Lynn Atchison ("Atchison") has served as a member of Bumble's Board since October 2020. She is the Chair of the Audit and Risk Committee (the "Audit Committee"). Pursuant to the Company's equity, non-equity, and other compensation plans, in 2021 and 2022, she received total compensation from Bumble of $75,000 and $210,607, respectively. As of April 2022, Atchinson beneficially owned 2,680 common units of Bumble shares.

37.    Defendant Sachin J. Bavishi ("Bavishi") has served as a member of Bumble's Board since January 2020. At Blackstone, he has been a Senior Managing Director since July 2013. He was selected by Blackstone to be a Board member of the Company.

38.    Defendant Matthew S. Bromberg ("Bromberg") has served as a member of Bumble's Board since July 2020; he is also a member of the Audit Committee. At Blackstone, he has been a Senior Advisor since May 2022. Pursuant to the Company's equity, non-equity, and other compensation plans, in 2021 and 2022, he received total compensation from Bumble of $75,000 and $329,887, respectively. As of April 2022, Bromberg beneficially owned 6,524

common units of Bumble shares.

39.    Defendant Amy M. Griffin ("Griffin") has served as a member of Bumble's Board since February 2021. She is the founder and managing partner of G9 Ventures, which was invited to participate in Blackstone-led investments in Spanx, Inc. and Supergoop! alongside Defendant Herd. Pursuant to the Company's equity, non-equity, and other compensation plans, in 2021 and 2022, she received total compensation from Bumble of $1,226,002 and $91,947, respectively. As of April 2022, Griffin beneficially owned 152,700 Class A Bumble stock.

40.    Defendant Jonathan C. Korngold ("Korngold") has served as a member of Bumble's Board since January 2020; he is also a member of the Compensation Committee. At Blackstone, he has been a Senior Managing Director, Global Head of Growth Equity Business, and Global Co-Head of Technology Investing since January 2019. He was selected by Blackstone to be a Board member of the Company.

41.    Defendant Jennifer B. Morgan ("Morgan") has served as a member of Bumble's Board since February 2021; she is also a member of the Governance Committee. At Blackstone, she was the Global Head of Portfolio Transformation and Talent from November 2020 to January 2021 and has been the Global Head of Portfolio Operations since January 2021. She was selected by Blackstone to be a Board member of the Company.

42.    Defendant Elisa A. Steele ("Steele") served as a member of Bumble's Board since July 2020; she is also the Chair of the Compensation Committee and a member of the Governance and Audit Committees. Pursuant to the Company's equity, non-equity, and other compensation plans, in 2021 and 2022, she received total compensation from Bumble of $75,000 and $329,887, respectively. As of April 2022, Steele beneficially owned 152,700 Class A Bumble stock.

43.    Defendant Pamela A. Thomas-Graham ("Thomas-Graham") has served as a

member of Bumble's Board since August 2020; she is also a member of both the Audit and Compensation Committees. Pursuant to the Company's equity, non-equity, and other compensation plans, in 2021 and 2022, she received total compensation from Bumble of $75,000 and $306,965, respectively. As of April 2022, Thomas-Graham beneficially owned 6,535 Class A Bumble stock and 5,886 common units of Bumble shares.

44.    The Defendants named in ¶31 are referred to collectively herein as "Blackstone." Bumble specified that each entity, along with the CEO of Blackstone, Schwartzman, "may be deemed to beneficially own the [Bumble] securities directly or indirectly controlled by such Blackstone entities or him" in the documents it filed with the SEC prior to the SPO.

45.    The Defendants named in ¶¶32-43 are referred to collectively herein as "Individual Defendants." Each signed or authorized the SPO Registration Statement Bumble filed with the SEC and solicited investors for the SPO for their own benefit and/or the benefit of Blackstone and its affiliates. Defendants Herd and Subramanian may be additionally referred to herein as "Executive Defendants." All Individual Defendants, apart from Subramanian, are further referred to herein as "Director Defendants."

**GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS**

**A.    DUTIES OF THE INDIVIDUAL DEFENDANTS**

46.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed and owe the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director

and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48. In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so the market price of the Company's stock will be based on truthful and accurate information.

49. To discharge their duties, the officers and directors of Bumble were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Bumble were required to, among other things:

A. Ensure the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

B. Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

C. Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring the Company maintained an

17

adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

D.    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

E.    Ensure the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

50.    Each Individual Defendant, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders the Individual Defendants were aware posed a risk of serious injury to the Company.

51.    Controlling stockholders Herd and Blackstone also presently owe and, at all relevant times, owed the Company the utmost duties of due care, good faith, and loyalty similar to those duties owed to the Company by the Individual Defendants.

**B.    DUTIES IMPOSED BY GOVERNING DOCUMENTS**

52.    The Company has also adopted a Code of Conduct (the "Code"). The Code opens with a statement from Defendant Herd which states, in pertinent part:

Our Code of Conduct is a guide for aligning our actions and decisions with our values and for making sure our business stays ethical and legal. At its core, the message is simple: act with integrity and speak up when you suspect we're not living up to that mark. When we do that, our business will thrive and we will earn the trust of our colleagues, user base, investors, and communities.

53.    The Code goes on to state:

Every one of us must comply with our Code of Conduct no matter our location or position. We also have policies and regulations that hold us to our standards. Bumble's board of directors has adopted the Code, and ***it applies to every director, officer***,[5] and employee of Bumble Inc. and its subsidiaries (collectively, "Bumble"), as well as third parties acting on our behalf. In the case of Bumble's non-employee directors, compliance with this Code is subject to the provisions of Bumble's amended and restated certificate of incorporation, amended and restated bylaws, and any stockholders agreement with Bumble.

\*       \*       \*

Failing to follow our Code damages our reputation and threatens the strength of our teams and our relationships with our users, investors, and communities.

We take violations seriously and we thoroughly investigate all instances of noncompliance. There are consequences for not following the guidance in our Code and policies, and in some cases a violation could also subject Bumble or individuals to civil and/or criminal penalties.

\*       \*       \*

**Insider Trading and Fair Disclosure**

We never buy or sell securities in Bumble or any other company while in possession of material non-public information or share material, non-public information about Bumble or any other company in connection with buying or selling stock or other securities, which is known as "insider trading" and is illegal. We also must maintain the confidentiality of the sensitive information entrusted to us by Bumble and others with whom we do business.

**Why We Do What's Right**

In the course of our jobs, we may have access to information that is not known to the public. Whether such information belongs to Bumble or another entity, we're careful to preserve our reputation as a company that can be relied on to protect information entrusted to us.

---

[5]    Unless otherwise noted, all emphasis is added and all internal citations are omitted.

Material, non-public information is information known to us but that has not been widely disseminated to the public, and which a reasonable investor would consider important in deciding whether to buy or sell securities.

Some examples of material information may include:

- Earnings and financial results
- Budgets and planning documents
- News about significant mergers, acquisitions, divestitures, arrangements with distributors, or other commercial transactions
- Major litigation
- Developments regarding Bumble's material intellectual property
- Significant product or partnership developments
- Senior management developments

***Insider trading occurs when an individual buys or sells securities while aware of material, non-public information related to those securities or shares material, non- public information with someone else who then buys or sells securities to which such information relates***.

Insider trading is a serious crime, punishable by heavy fines and even imprisonment. Our success in the marketplace requires the trust and confidence of the investment community. Sustaining this trust requires that we act with integrity when trading public securities and follow federal and state securities laws.

Bumble is also subject to rules and regulations that prohibit the disclosure of material information to securities analysts and other market professionals before making it available to the public. These rules and regulations require publicly traded companies to previously or simultaneously make public any material, non-public information (oral or written) that a company discloses to the financial community and to shareholders. ***Bumble may not communicate material, non-public information selectively to analysts or shareholders***.

**How We Live Our Code**

We can help prevent insider trading and market abuse by:

- Never buying, selling, or otherwise dealing with stock or other securities of Bumble or any other publicly traded company when in possession of material, non-public information.
- Not disclosing material, non-public information to anyone outside Bumble, including family members, relatives, or friends.
- Sharing material, non-public information, including with fellow team members, only on a need-to-know basis.
- Not engaging in "tipping," which means directly or indirectly passing along material, non-public information about any company to anyone who may trade

while aware of such information.

- Never assisting investors or securities analysts with information about Bumble, its competitors, or the industry except if that is clearly part of your job.

- Acknowledging that only certain persons specified in the Policy and Procedures for Compliance with Regulation FD are authorized to communicate information concerning Bumble to investors, securities analysts, and other market professionals.

54.    In a section titled "Accurate Records," the Code states:

We maintain complete and accurate records so that we can make responsible business decisions and provide full, fair, accurate, timely, and understandable disclosure in reports and documents Bumble submits to the [SEC] and other government agencies and in other public communications.

*        *        *

Bumble depends on proper records for making strategic and informed decisions, building trust with stockholders and users, and complying with and enforcing the law. As a public company, **securities laws require Bumble to maintain our records**.

55. The Code of describes the process of maintaining "the integrity of our books and records by:"

- Complying with generally accepted accounting principles, internal controls, and all relevant laws and regulations

- Recording all assets, liabilities, revenues, expenses, and business transactions completely, accurately, in the proper period, and in a timely manner;

- Ensuring that records are submitted to internal and external auditors promptly and accurately;

- **Never misleading or misinforming anyone about our business operations or finances**; and

- Reporting any concern that a record is inaccurate, false, or misleading to the Audit Committee.

56.    The Code explains the importance of maintaining proper internal controls as follows:

Internal controls and procedures are in place to protect Bumble, our stockholders, our users, and others. They have been established to reduce risks to our business, and especially to prevent fraud, uncover and minimize errors, promote operating efficiency, and achieve compliance with our policies and the law.

57.     In addition to the Code and other policies, Bumble's Senior Financial Officers, which include Defendants Subramanian and Herd, are required to comply with a Supplemental Code of Ethics (the "Supplemental Code"), "the purpose of which is to promote honest and ethical conduct and compliance with applicable law, particularly as related to the maintenance of the Company's financial books and records and the preparation of its financial statements."

58.     Pursuant to the Supplemental Code, Senior Financial Officers are required to:

- Engage in and promote ethical conduct;
- Carry out their responsibilities honestly, in good faith and with integrity, due care and diligence, exercising at all times their best independent judgment;
- ***Assist in the production of full, fair, accurate, and timely and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC]*** and other regulators and in other public communications made by the Company;
- Comply with applicable laws, rules, and regulations; and
- Promptly bring to the attention of the Chief Legal Officer any violation of the Code of Conduct or this Supplemental Code.

59.     The Supplemental Code continues:

Each Senior Financial Officer will be held accountable for adherence to the Supplemental Code and the Audit Committee shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Supplemental Code by a Senior Financial Officer, up to and including termination. Violations of this Supplemental Code may also constitute violations of law which may subject a Senior Financial Officer and the Company to criminal and civil penalties.

60.     In addition, the Company's Audit and Risk Committee—which includes Director Defendants Atchinson, Steele, and Thomas-Graham—is specifically tasked with key portions of the Board's oversight responsibilities. The conduct of the Audit and Risk Committee is governed by the Audit and Risk Committee Charter (the "Charter").

61.     Pursuant to the Charter:

The Audit and Risk Committee (the "Committee") shall provide assistance to the Board of Directors (the "Board of Directors") of Bumble Inc. (the "Company") with respect to its oversight of:

- The quality and integrity of the Company's financial statements, as well as oversight of the Company's accounting and financial reporting processes and financial statement audits;
- The effectiveness of the Company's control environment, including internal controls over financial reporting;
- ***The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;***
- The independent registered public accounting firm's qualifications, performance and independence;
- The effectiveness of the Company's risk management processes, particularly with respect to financial risk exposure;
- The performance of the Company's internal audit function; and
- The Company's technology security and data privacy programs.

*        *        *

The Committee should discuss the Company's major risk exposures, including operational, financial (including the risk of fraud), data privacy and security, legal, regulatory and reputational risks, and the steps management has taken to monitor and control such exposures.

62.     In addition to the fiduciary duties described above, the Governance Committee's Charter requires its members—Director Defendants Mather, Morgan, and Steele—to review and assess the adequacy of Bumble's corporate governance guidelines and recommend proposed changes to the Board.

63.     Furthermore, the Board has adopted a set of corporate governance guidelines to promote the functioning of the Board and its committees and to set forth a common set of expectations as to how the Board should perform its functions (the "Corporate Governance Guidelines").

64.     The Corporate Governance Guidelines include the following language:

The Board of Directors (the "Board") of Bumble Inc. (the "Company") has adopted these corporate governance guidelines, which describe the principles and practices that the Board is expected to follow in carrying out its responsibilities. ***It is expected that these guidelines will be reviewed by the [Governance Committee] from time to time to ensure that they comply with all applicable laws, regulations and stock***

23

*exchange requirements.*

*    *    *

The Board directs and oversees the management of the business and affairs of the Company in a manner consistent with the best interests of the Company and its stockholders. The Board's responsibility is one of oversight, and in performing its oversight role, the Board serves as the ultimate decision-making body of the Company, except for those matters reserved for or shared with the Company's stockholders. The Board selects and oversees the members of senior management, who are charged by the Board with conducting the business of the Company.

The Board exercises direct oversight of strategic risks to the Company in regular coordination with the Company's management. The Audit Committee reviews guidelines and policies governing the process by which senior management assesses and manages the Company's exposure to risk, including the Company's major financial and operational risk exposures and the steps management takes to monitor and control such exposures. The Compensation Committee oversees risks relating to the Company's compensation policies and practices. The [Governance Committee] assists the Board by overseeing and evaluating programs and risks associated with Board organization, membership and structure and corporate governance. Each committee charged with risk oversight reports to the Board on those matters.

*    *    *

In their roles as directors, all directors owe a duty of loyalty to the Company and its stockholders. Directors must act with integrity in their dealings with and on behalf of the Company and demonstrate a commitment to the Company's values. The Company has adopted a Code of Conduct (the "Code"), which includes a compliance program to enforce the Code, and directors are expected to adhere to the Code.

## SUBSTANTIVE ALLEGATIONS

### A.    BUMBLE'S HISTORY & GENERAL OPERATIONS

65.    Bumble conducts its business largely through its Bumble and Badoo dating Apps. Like many apps offering services under a "freemium" model, neither the Bumble nor the Badoo App has yet to achieve profitability. For example, Bumble reported a net loss of $26.1 million in 2020. Therefore, it is critical to its investors and the health of the Company itself that Bumble increases year-over-year the number of users paying for its premium services until it can achieve

24

profitability.

66.    The Badoo App was launched as a website in 2006 by Russian entrepreneur and billionaire Andrey Andreev ("Andreev") and is currently one of the world's most widely used dating apps. Its marketing focuses heavily on how the App verifies its users are real. It is most popular in Europe and Latin America.

67.    In 2014, Andreev and Herd—who had recently co-founded Tinder, another popular dating service and now a major competitor of Bumble—co-founded Bumble. The Bumble App markets itself as a feminist dating app which empowers women by requiring them to "make the first move" and initiate conversations with men, rather than the other way around, which is more typical in online dating platforms.

68.    In June 2019, Andreev founded MagicLab to serve as the parent company of his dating and social networking apps, which included Bumble and Badoo, among others.[6]

69.    In 2019, a *Forbes* investigative report included accounts of former Company employees who worked on the Badoo App at its London headquarters who described the company as having a culture of "sex, drugs, misogyny and sleaze" that was "clearly toxic, especially for women." This attention from the *Forbes* article compelled Andreev to sell his entire stake in MagicLab, which he initially purchased for $10 million, to Blackstone for $2 billion in 2020, as further discussed *infra*. Under the terms of the deal, which valued the Company at around $3 billion, Herd replaced Andreev as MagicLab's CEO with Herd holding onto the vast majority of her ownership.

70.    Bumble, both internally and in SEC filings, regularly tracks metrics key to measure the Company's health. Those metrics include, but are not limited to, how many of its users are

---

[6]    MagicLab was renamed Bumble in July 2020.

paying for premium services, how revenue much each paying user generates, how many users are on the Apps overall, and whether Company marketing or organic means, such as word-of-mouth, compelled each user to install its Apps and/or use premium features.

71.    Operationally, Bumble's marketing entices users to download and use its Apps for free and then attempts to convert them to paying users by advertising how its premium features enhance users' experiences on the App. Bumble closely tracks its monthly users and new registrations because any decline in overall usage and registration of new users signals that a decline in paying users will soon follow. Although the Company does generate some income through selling third-party advertising to its free users, most of its revenue derives from paying users.

**B.    BUMBLE'S IPO & BLACKSTONE'S SUBSEQUENT CONTROL OVER BUMBLE**

72.    In January 2020, Blackstone bought a majority stake in Bumble for $2 billion. Pursuant thereto, Bumble and Blackstone executed a Stockholders Agreement and a Registration Rights Agreement to solidify Blackstone' control over the Company for the foreseeable future.

73.    Because the Stockholders Agreement gave Blackstone and Herd the right to designate the majority of the Company's directors based on their percentage ownership of Bumble's outstanding shares, Blackstone had the right to designate five of the Company's eleven Board members at the time of the SPO and Herd the right to designate one. Together, they have the right to elect six out of eleven members of the Board, constituting a simple majority.

74.    Further, also pursuant to the Stockholders Agreement, Blackstone could appoint a non-voting observer to all Board meetings. During relevant times herein, it appointed Martin

Brand,[7] the Head of North America Private Equity and Global Co-Head of Technology Investing at Blackstone, to that role. The same Agreement provided Blackstone with nearly unrestricted access to Bumble's confidential information. For example, Bumble was required to periodically deliver to Blackstone certain reports and information packages related to its operations, capital expenditures, budgets, and cash flows. If Blackstone wanted, it could request additional books and records from Bumble or discuss the Company's affairs and condition with its officers and directors.

75.    The Registration Rights Agreement gave Blackstone the right at any time to force Bumble to initiate a registered public offering, such as the SPO, so Blackstone could sell its shares of Bumble at the Company's expense. Blackstone had the right to select the offering's managing underwriters and any advisory services as well as review and comment on any documents Bumble filed with the SEC.

76.    Blackstone and its affiliates, such as Defendant Blackstone Buzz Holdings L.P., were also parties to a Support and Services Agreement which allowed Blackstone nearly unfettered access to Bumble's internal metrics. The Agreement specifically provided that Bumble was required to "accept the amount and type of [operations] support as may be determined by [Blackstone] in its sole discretion."

77.    Bumble generally has no assets outside of its ownership of common units of its shares, which are currently divided into common units and incentive units.[8] Common units

---

[7]    Mr. Brand also serves as a member of several of Blackstone's investment committees. He was involved in Blackstone taking a majority stake of Bumble (MagicLab), and thus has been there from the start of Blackstone's control of the Company. At the time of the transaction, Mr. Brand stated, "We look forward to partnering with MagicLab to help fuel the company's continued expansion in the years ahead."

[8]    Prior to the IPO, common units were "Class A" shares and incentive units were referred to as "Class B" shares.

currently sell on NASDAQ under the symbol "BMBL." According to the Company's Charter, each common unit entitles the holder to one vote unless the holder is Herd or Blackstone, which are each entitled to ten votes for each common unit they own until the earlier of February 2028 or when they collectively cease to own more than 7.5% of the outstanding common units. Holders of incentive units have no economic rights, but the units entitle the holder to the same number of votes as total common shares the holder owns unless the holder is Herd or Blackstone, whom are each entitled to ten times the votes they would otherwise be entitled to.

78.    The Company's Charter provisions, which give Herd and Blackstone ten-to-one voting power over all other stockholders, give each of them overwhelming control over the Company. Prior to the IPO, Blackstone controlled 87% of Bumble's voting power. According to the Company's 2022 Proxy Statement filed with the SEC in April 2022, Blackstone and Herd still control 92.2% of Bumble's total voting power and remain its majority stockholders.

79.    Bumble summarizes Blackstone's control in its most recently filed 10-K as follows:

**Risks Related to Ownership of our [Common Units]**

***Our Principal Stockholders control us and their interests may conflict with ours or yours in the future.***

As of the date of this Annual Report, our Principal Stockholders beneficially own approximately 92% of the combined voting power of our [common and incentive units]. Moreover, we nominate to our Board individuals designated by our Principal Stockholders in accordance with the stockholders agreement. Our Principal Stockholders have the right to designate directors subject to the maintenance of certain ownership requirements in us. Even when our Principal Stockholders cease to own shares of our stock representing a majority of the total voting power, for so long as our Principal Stockholders continue to own a significant percentage of our stock, they will still be able to significantly influence or effectively control the composition of our Board of Directors and the approval of actions requiring stockholder approval through their voting power. Accordingly, for such period of time, our Principal Stockholders will have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers. In particular, for so long as [Blackstone] continues to own a significant percentage of our stock, [Blackstone] will be able to cause or prevent a change of control of our company or a change in the composition of our Board of

Directors and could preclude any unsolicited acquisition of our company. The concentration of ownership could deprive you of an opportunity to receive a premium for your shares … and ultimately might affect the market price of our [common units].

## C.    BUMBLE'S PERFORMANCE FALTERS IN EARLY 2021 AND BLACKSTONE RACES TO INITIATE THE SPO

80.    Bumble's IPO Prospectus—filed with the SEC on February 11, 2021—marketed the Company to investors by boasting of its strong 22% growth in paying users between 2019 and 2020. Bumble then continued to report significant paying user growth in subsequent SEC filings. For example, for the first and second quarters of 2021 ("1Q21" and "2Q21"), in its quarterly 10-Q reports, it boasted of a 30% and 20% year-over-year increase in paying users, respectively.

81.    Despite these results, the Board was aware prior to the end of 3Q21 the Company would face significant risks throughout the fiscal year of 2021 ("FY2021") and into the fiscal year of 2022 ("FY2022") for the foreseeable future. For example, Bumble's FY2020 10-K, filed with the SEC on March 15, 2021, shows the Board knew Google implemented a policy which would force Android Operating System ("OS")[9] users to pay for Bumble's premium services only through Google Play's in-app billing services. The Board also knew that Google, during FY2021, would collect a 30% processing fee on all such transactions.[10] Although Google announced a limited grace period for qualifying companies through the end of September 2021, the Board knew

---

[9]    Android OS is an operating system for touchscreen mobile devices. *See* Wikipedia, Android, at https://en.wikipedia.org/wiki/Android_(operating_system) (last visited April 7, 2023). Nearly all smartphones sold in the United States—aside from those sold by Apple Inc., which run on Apple iOS—come pre-installed with a proprietary Google version of the Android OS. Android users can install software, typically called "apps," on their device through the Google Play Store, which is owned by Google, serves as its proprietary digital distribution platform, and comes pre-installed on nearly all Android devices. Wikipedia, Google Play, at https://en.wikipedia.org/wiki/Google_Play (last visited April 7, 2023). The Bumble and Badoo Apps are available for download at the Google Play Store for Android users.

[10]    Prior to using Google Play, Bumble accepted payment directly from Android users and paid less than 3% in fees. *See* Visa USA Interchange Reimbursement Fees at 7-9 (April 23, 2022).

compliance "may adversely affect [Bumble's] revenue." Further, if the Apps were removed from the Google Play Store entirely for noncompliance, the Board knew "it would ***materially*** adversely affect [Bumble's] business, financial condition, and the results of operations."

82.    According to allegations made in the Securities Class Action, former Bumble employees confirmed the Company used internally built systems and in-house tools to track and view key user metrics on at least a monthly, but sometimes a daily, basis. One employee confirmed Bumble's declining user metrics in the United States was discussed in explicit terms in meetings. Another employee described the Badoo App as in "absolute shambles" because the App's reputation with consumers was poor and, as internal metrics made clear, its growth was non-existent. Both employees had the opinion the Company was not dedicating enough marketing to the Apps.

83.    On March 9, 2021, the entire Board met. BMBL_SCH000002122.[11] Director Defendants Mather, Thomas-Graham, Atchinson, Bromberg, Herd, Korngold, Bavishi, Griffin, Morgan, and Anderson were present. Executive Defendant Subramanian was also present, along with Bumble President Tariq Shaukat ("Shaukat"). *Id.* During his presentation, Shaukat ███████ ███████████████████████████████████████████████████████████ ███████ As for the Badoo App, however, he noted ███████████████████████ which prompted the Board and Company management to engage "in a discussion regarding the challenges to Badoo." Shaukat also discussed a report which focused, among other things, on ████████████████████, which prompted Company management to discuss "the challenges in the Bumble and Badoo [App] ecosystems." BMBL_SCH000002122-23.

---

[11]    All citations to "BMBL_SCH____" refer to the production of documents in response to Plaintiff Schirano's inspection demand pursuant to Section 220, which was also produced to Plaintiff Glover-Mott.

84.    The materials presented to the Board in connection with the meeting noted that █████ ████████████████████████████████████████████████████ and there was a ████████████████████████████ for both Apps. Specifically, █████████ on the Bumble App were ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████ Monthly metrics also showed █████████████████████ on the Bumble App, which █████████████████████████████ in the last two months of 2020. Further, ████████████████████████ in all but three of the Bumble App's markets during the year. For the Badoo App, its ██████████████████ █████████████████████████████, and it was ████████████████ █████████████ with the ██████████████████████████ Like the Bumble App, the Badoo App's ██████████████████████████████ █████████████ Further, the COVID pandemic, including related lockdown measures, was █████ ██████████████████████ and █████ for both Apps, but especially the Badoo App. Finally, the Google Play Store's new policies were ████████████████████████████████████ BMBL_SCH000001987-88, 1993, 1996, 1997, 1999-2002.

85.    The materials also informed the Board that █████████████████████████ ████████████████████████████████████████████████████ BMBL_SCH000001996.

86.    The Board also reviewed the results of a report of its █████████████████ ██████████████████ over both Apps in ██████████████████████████. The

31

report highlighted how the Bumble ███████████████████ was driven

partially by ████████████████████████████████ ██ ██, which resulted

in a ████████████████████████████████ who were ████████████████

████████████████████████████. The report also highlighted

how ████████████████████████████████████████████████

████████████ had resulted in ████████████████████ and ████████████████

████████████████████████████████ Moreover, the report showed the Badoo App

had ████████████████████████████ which generated ██████████████████████

BMBL_SCH000002008-14.

87.   The materials for the Board meeting also included a specific section highlighting

the Company's issues with ████████ Namely, the Company affirmed that, ██████████████████

████████████████████████████████████████████████████████████

█████████████████████, and would result in ████████████████████████████

████████████ Even though Bumble had ████████████████████████████████ wherein

████████████████████████████████████ the Company concluded it was

clear ████████████████████████████ Bumble estimated ████████████████████

████████ would result in a ████████████████████████ or approximately ████████████████

████████ As a result, management concluded ████████████████████████████████

████████ and the ████████████████████ Importantly,  the  materials  **specifically**  mentioned

████████████████████████ would likely result in a ████████████████████████████

---

[12]   Gen X are generally defined as those born in 1965-1980 and in their 40s and 50s.
Millennials were born in 1981-1996 and are either in their mid-to-late 20s or 30s. Gen Z were born
1997-2012 and are typically teenagers or in their early-to-mid 20s.  *See* Wikipedia, Generation, at
https://en.wikipedia.org/wiki/Generation (last visited April 10, 2023).

*in the fourth quarter of 2021*, which is when the SPO occurred. BMBL_SCH000002038, 2043-44.

88.    On March 9, 2021, the Audit Committee of the Board also met. Director Defendants and committee members Atchinson, Bromberg, and Thomas-Graham were present. At the invitation of the committee, Director Defendant Mather was present, along with Executive Defendants Herd and Subramanian and Company President Shaukat. At the meeting, Subramanian discussed "potential impacts of certain headwinds facing the business in the latter half of" 2021; presumably, including the ███████████████████████████. BMBL_SCH000001954-55.

89.    The Audit Committee also reviewed materials largely identical to those presented to the full Board. For example, management repeated the ███████████████████ is due to ████████████████████████████████████ ████████████████████ in the fourth quarter of 2021. BMBL_SCH000001968.

90.    On May 7, 2021, approximately two months later, the entire Board met again. Director Defendants Mather, Thomas-Graham, Atchinson, Bromberg, Steele, Korngold, Bavishi, Griffin, Morgan, and Anderson were present. Executive Defendants Herd and Subramanian were also present, along with Bumble President Tariq Shaukat ("Shaukat"). During their presentations, Subramanian and Shaukat discussed marketing spending and user metrics during the first quarter of 2021. Upon reviewing the materials provided to them by management, the Board members *unanimously* decided "it was advisable and in the best interests of the Company and its stockholders to approve" the SPO, which would be financed by Bumble wholly for the benefit of its largest stockholder, Blackstone. BMBL_SCH000002140-42.

91.    The materials the Board reviewed pursuant to the meeting noted the ████████

its ███████ and whatever ███████ Overall, year-to-year Company ███████

███████

███████

███████ year-to-year in most markets while ███ ███████. Management noted ███████ ███████ but not in the ███████ ███████ Key metrics for the Badoo App were noted as ███████ ███████ Changes implemented during or prior to 2Q21 to attempt to improve ███████ or, if they ███ ███████ The Company thus estimated it would face a ███████ ███████ MBL_SCH000002164-75, 2191.

92.    Like the materials for the previous Board meeting, the materials for the May 7, 2021 meeting noted although ███████, such ███████ ███████ Moreover, even though the Company's ███████, the resulting ███████ Even though ███████ ███████, the Company still decided it would ███ ███████ in the last two quarters of 2021 ███████

███████

BMBL_SCH000002169, 2191.

93.     Like the materials for the prior Board meeting, management specifically highlighted the Company's issues with ██████ Namely, ████████████████ ████████████ with ██████ and had a ████████████████████ ████████████████████████████████████████ ████████████ Management reiterated the Company would face a ████████ ████████████████ in the last quarter of 2021 ████████████████. Management concluded ████████████████████ BMBL_SCH000002231, 36-37.

94.     On May 7, 2021, the Audit Committee of the Board also met. Director Defendants and committee members Atchinson, Bromberg, and Thomas-Graham were present. At the invitation of the committee, Director Defendant Mather was present, along with Executive Defendants Herd and Subramanian and Company President Shaukat. At the meeting, Subramanian presented forecasts for 2021 ████████████████████. BMBL_SCH000002052-53.

95.     The Audit Committee also reviewed materials largely identical to those presented to the full Board. For example, the Audit Committee was informed the Badoo App's ████████ ████████████ and ████████████████████████████████████ ████████ in the fourth quarter of 2021. The Committee also reviewed the results of an external audit performed by Ernest & Young LLP, all of which Bumble redacted in response to Plaintiff Schirano's Section 220 demand. BMBL_SCH000002060, 2065, 2068-2117.

96.     Pursuant to the Board's May 7, 2021, decision to approve the SPO, the Board adopted Resolutions of the Board of Directors on May 10, 2021 (the "Resolutions"). The Resolutions specifically noted Bumble was *required*, by virtue of the Registration Rights Agreement, to call a new public offering whenever Blackstone wanted to sell its common units. The Resolution authorized Company officers to prepare and submit registration statements to the

SEC in compliance "with the rules and regulations under the Securities Act." The Resolution also approved "the engagement of the underwriters for any [SPO] on such terms and conditions as [Blackstone] shall approve." It specifically noted Blackstone had selected Buzz Holdings L.P., its own affiliate. Finally, the Resolution "confirmed and ratified" the Company would pay "all fees and expenses … that may be incurred in connection with" the SPO to the detriment of Bumble. BMBL_SCH000002153-56.

97.    Documents received pursuant to Plaintiff Schirano's Section 220 demand, and which were also produced to Plaintiff Glover-Mott, show the Defendants had access to Company performance reports on a ███████ from May to September 2021 which were further ████ ██████████████████████████████████████████████, especially those in key markets, ███████████████. The same revealed the Badoo App's ████████ ████████████████████████████████████ from the end of 2Q21 through the date of the SPO. In contrast, the ██████████████████████ ████████████████████████████████████████ thereby showing ██████████████████████████████ Further, the Bumble App's ████████████████████████████████████████ ███████████████ The Badoo App's performance █████████████ ████████████████████████████████ while overall ████████████████████████████ BMBL_SCH000001734, 1756, 1778, 1800, 1822, 1844, 1866, 1888, 1910, 1932.

98.    On August 9, 2021, approximately three months later, the entire Board met for a third time. Director Defendants Mather, Thomas-Graham, Atchinson, Bromberg, Steele, Korngold, Bavishi, Griffin, Morgan, and Anderson were present. Executive Defendants Herd and

Subramanian were also present, along with Bumble President Shaukat and four representatives from Blackstone, including Martin Brand. During her presentation, Herd "reviewed certain challenges facing" the Company, "in particular as they relate to ███████████████ ███████████████████████████████ In his presentation, Shaukat reviewed "certain challenges on [the Badoo App] relating to ████████████ Shaukat also reviewed how the ██████████████████████████████ on the Badoo App had resulted in ██████ ████████ which █████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████ The Board openly discussed ███████████████████████ because of ████████ policies. Then, Subramanian presented the forecast for Company performance for the rest of 2021, which she updated in July 2021. BMBL_SCH000000129-30.

99.    The materials the Board reviewed pursuant to the meeting noted the Badoo App's █████████████████████████████████ mostly due to ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████. Management forecasted the Badoo App's ████████ would be ██████████████████ by the end of 2021. Across both Apps, year-over-year ███████████████ █████████████████ in the 2Q21 while ███████████████████████████████ ████████████████. Even the Bumble App was █████████████████████████████ █████████████████████████████ its ████████████████████████████ ████████ from April to May 2021, and its revenue, ████████████████████████ █████████████████████████████ Specifically, ████████████████████ and/or ████████████████████████ continued to ██████████████████████████ year-over-

year. Management noted ██████████████████████. Reports showed, compared to

competitors and other major dating platforms like Tinder and Hinge, ██████████████

██████████████ BMBL_SCH000000270, 273-74, 277-79, 281-83, 285, 291-92, 315.

100.    Like the prior Board meetings, this meeting's materials specifically highlighted the

Company's issues with ██████ Namely, Badoo's ████████████████████████

████████████████████ As a result, ████████████████████████

████████████████████████████████████ until December 31,

2021. ██████████ was noted to have an acute impact in the ██████████████

██████████████████ because of ████████████████

████████████████████████████████████████████

Management forecasted the new ██████████████████████████████

██████████ by the end of 3Q21. While the materials discussed the necessity of finding

██████████████, none of the materials revealed the Board had ██████████████

██████████████████████. Management continued to

warn that ████████████████████████████████████

██████████ Even the Bumble App ████████████████████, as management

noted most ████████████████████████ BMBL_SCH000000289,

295, 308.

101.    Unlike the prior Board meetings, however, this meeting's materials specifically

highlighted the Badoo App's issues. Management characterized the ██████████████ as

██████████ and the App's ████████████████████. Namely, its ██████ was

████████████████████████. Since the end of 1Q21, the

App's ████████████████████ had ██████████ and ██████████████



. Decreases ███████████████ ████████████████████████████████████████ with only Apple iOS's ██████████████████████████ BMBL_SCH000000351, 354-57.

102.    On August 9, 2021, the Audit Committee of the Board also met. Director Defendants and committee members Atchinson, Bromberg, and Thomas-Graham were present. At the invitation of the committee, Director Defendant Mather was present, along with Executive Defendants Herd and Subramanian and Company President Shaukat. At the meeting, Subramanian presented financial results for 2Q21. BMBL_SCH000000125.

103.    The Audit Committee also reviewed materials largely identical to those reviewed by the full Board. For example, the Audit Committee was informed by management the Badoo App's ██████████████████████████ and overall █ ████████████████████████████████ ████████████████ BMBL_SCH000000144.

104.    As such, by the date the SPO opened, the Individual Defendants possessed and reviewed at least two months and ten days of data, comprising a significant majority of 3Q21. That data showed the rosy results of 1Q21 and 2Q21 would not materialize going forward.

**D.    THE BOARD MAKES FALSE AND MISLEADING STATEMENTS IN BUMBLE'S SEC FILINGS IN THE FALL OF 2021 TO ENSURE SUCCESSFUL COMPLETION OF THE SPO SOLELY FOR BLACKSTONE'S BENEFIT**

105.    By virtue of the Support and Services Agreement, Registration Rights Agreement, and Stockholders Agreement, and through its Board designees, Defendant Blackstone also had access to this confidential information, which showed the Company's general health was not as rosy as its SPO Prospectus and Registration Statement revealed to the general investing public.

106.    Namely, on September 7 and 13, 2021, respectively, Bumble filed with the SEC a Registration Statement and final Prospectus for the SPO that was signed by all Individual

Defendants. The materials contained numerous untrue statements of material facts, and/or omitted to state other facts necessary to make the statements therein not misleading.

107.    Bumble's SPO filings represented that it "expect[ed] to increase paying users and average revenue … over time." For example, the Registration Statement stated as follows:

> **A Large, Growing, Engaged Community.** We have created *a large, growing and engaged community* with approximately *2.9 million average Total Paying Users* as of June 30, 2021, up 24.9% from June 30, 2020. The sheer scale of our platform creates powerful network effects, with more users on the platform improving selection, which improves user experience and *drives even more users to our platform*.

108.    The Registration Statement also claimed both Apps were "market leaders" as follows:

> *Bumble is a leader in the online dating sector across several countries, including the United States, United Kingdom, Australia and Canada.* We believe that because women feel more confident and empowered on our platform, they are more engaged than on other dating apps. As a result, we believe that Bumble has one of the highest percentages of women Paying Users among dating apps. According to OC&C Strategy Consultants LLP, UK ("OC&C"), within the North America freemium market, Bumble has approximately 30% more female users for every male user compared to the gender mix of users in the market who do not use Bumble. Additionally, according to OC&C, a higher percentage of Bumble's female users convert to payers than the market average. *We had approximately 1.4 million Bumble App Paying Users* during the six months ended June 30, 2021.

> *       *       *

> The Badoo app, founded by Andrey Andreev and launched in 2006, was one of the pioneers of web and mobile free-to-use dating products. Badoo's mantra of "Date Honestly" extends our focus on building meaningful connections to everyone. *Badoo continues to be a market leader* in Europe and Latin America and is diversified across geographies as a top three grossing iOS lifestyle app in 73 countries as of July 31, 2021. *We had approximately 1.5 million Badoo App and Other Paying Users* during the six months ended June 30, 2021.

109.    These statements were buttressed by emphasis on outdated 2Q21 data purporting to show how both Apps' total paying users had materially grown for every period leading up to the SPO. For example, the Registration Statement stated Bumble had 0.574 million paying users

as of December 31, 2018, which had grown to 0.856 million paying users as of December 31, 2019, and then to 1.14 million users as of December 31, 2020, and to 1.41 million paying users as of June 30, 2021. The Registration Statement also stated Bumble's individual paying user count for its Badoo App had grown from 1.13 million paying users as of December 31, 2018, to 1.19 million paying users as of December 31, 2019, and then to 1.36 million paying users as of December 31, 2020, and to 1.45 million paying users as of June 30, 2021.

110.    These statements were false and misleading because they failed to disclose the material facts which existed at the time of the SPO and were known to the Defendants. For example:



A.    The Badoo App's ▮▮▮▮▮▮ had ▮▮▮▮▮▮▮▮ throughout 3Q21 from ▮▮▮▮▮▮▮▮▮▮▮▮ as of August 29, 2021, its ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ since the end of 1Q21, it ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ by the beginning of August 2021, its ▮▮▮▮▮▮▮▮▮ ▮▮▮▮ by the end FY2021, and its ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ with even its ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.

B.    The Company had not developed any ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it projected those ▮▮▮▮▮▮▮▮. Specifically, the Company did not disclose it had already ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and had repeatedly estimated ▮▮▮▮▮▮▮▮▮▮ by the end of 3Q21, which would occur just days after the SPO was completed.

C.    The Bumble App had suffered ▮▮▮▮▮▮▮▮▮▮ for years

and suffered ███████████████████████████████████████████████

███████████████████████. Therefore, its reported ████████████████████

██████ into ███████████████████████████████████. Moreover,

metrics touting the ████████████████████ concealed how those metrics would

██████████████████████████████████████████████, as the ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

D.    While the documents disclosed key results from the end of 2Q21, they

omitted that the Company generated and reviewed metrics on at least a monthly and ███████

████████████████████████████, throughout the end of August 2021. Those metrics

reflected how the rosy growth results of 1Q21 and 2Q21 were certain not to materialize in

3Q21, 4Q21, or FY2022.

E.    The documents did not disclose how the Company's marketing, particularly

for the Badoo App, had █████████████████████████████████████████

████████████████████████████████████, by █████████████████████████

███████████████████████████████████████████████.

F.    As a result of the forgoing, the Company's business metrics and financial

prospects were not nearly as strong as its SEC filings prior to the SPO represented.

111.    The SPO was successfully completed by the Individual Defendants, enabling

Blackstone to sell 20.7 million shares of its Bumble common units to the public at $54 per share,

generating more than $1.1 billion in gross proceeds, based on the false and misleading statements

alleged above.

112.    Moreover, the SPO was completed on September 15, 2022, at the expense of

Bumble, which paid $33.5 million in fees to the underwriters Blackstone selected for the SPO, one of which, Blackstone Securities Partners L.P., was Blackstone's affiliate. Indeed, in its SEC filings submitted pursuant to the SPO, Bumble disclosed that Blackstone Securities Partners L.P. has a conflict of interest.

113.    The SPO was for the sole benefit of Blackstone and its affiliates. As noted in Bumble's 10-Q filed with the SEC for 3Q21:

> Bumble did not sell any shares of [common units] in the offering and did not receive any of the proceeds from the sale. ***Bumble Inc. paid the costs associated with the sale of shares by [Blackstone]***, net of the underwriting discounts.

**E.    JUST WEEKS AFTER CONSUMMATING THE SPO, THE BOARD IS FORCED TO REVEAL THE TRUTH OF BUMBLE'S NEGATIVE PERFORMANCE**

114.    On November 10, 2021, Bumble announced its 3Q21 results. For the first time, since its IPO, the Company posted a decline in overall user growth. The Company disclosed what the Board knew all along—rather than experiencing a growth in paying users across both Apps, the Company's total paying user count had declined to 2.86 million, well below the 2.9 million it reported as of 2Q21 and highlighted in its SPO filings.

115.    Bumble held a conference call for 3Q21 the same day. During the call, Subramanian stated: "Badoo App and other revenue totaled $58 million, down $1.7 million or 3% year-over-year. In [this quarter], we saw a 9% year-over-year decrease in paying users." Subramanian explained the declines as follows:

> As you heard just now from [Herd], the decline in paying users reflects the headwinds in some geographic demographic markets that have been more impacted by COVID and the continued erosion in desktop and mobile web usage. Paying users were also impact for part of the [3Q21] where we disabled certain payment mechanisms on the Android platform.

116.    What was not, and has never been, publicly disclosed, however, was the full extent of the wrongdoing that occurred at Bumble, including the Board's knowledge of and

involvement in the false and misleading statements that fueled the SPO for the benefit of Blackstone.

117.    On November 11, 2021, Bumble's stock price closed at $38.56 on a dramatic single-day decline of over 19% with extremely heavy trading volume. By market close on November 12, 2021, Bumble's stock price had declined more than 28% to $36.55 with elevated trading volume.

118.    Thereafter, the price of Bumble common units declined substantially and stayed low; as of early April 2023, it traded below $19 per share, a decline of more than 65% from the SPO price of $54 per share.

119.    Following the 3Q21 announcements, many analysts wrote how Bumble and both of its Apps fell significantly short of consensus expectations for its paid user and revenue growth and lowered targets for Bumble share prices accordingly.

120.    As a result of the foregoing, on January 24, 2022, the Securities Class Action was filed, naming Bumble, the Individual Defendants, Blackstone, and others as defendants. The Securities Class Action alleged claims for violations of §§ 11, 12(a)(2), and 15 of the Exchange Act in connection with the SPO.

121.    In March 2023, the parties to the Securities Class Action executed a settlement agreement that released the claims in the Securities Class Action in exchange for monetary consideration of $18 million.  The Company's most recent Form 10-Q filing reflects that the $18 million settlement amount was paid not just by the Company's insurers, but also ***by the Company itself***. Indeed, according to the same filing, "[d]uring the second quarter of 2023, the Company made a payment of $18.3 million to settle litigation matters."

122.    In August 2023, the Securities Class Action court granted final approval of the

settlement.

**F.    THE BOARD MAKES FALSE AND MISLEADING STATEMENTS IN BUMBLE'S 2022 PROXY STATEMENT**

123.    On April 22, 2022, Bumble filed its 2022 Proxy Statement with the SEC pursuant to § 14(a) of the Exchange Act.

124.    The 2022 Proxy Statement contained statements urging stockholders to re-elect Director Defendants Mather, Korngold, Morgan, and Thomas-Graham to the Board pursuant to the expiry of their staggered three-year term as of June 7, 2022.

125.    Regarding director qualifications, the 2022 Proxy Statement stated:

Our Board seeks to ensure that it is composed of members whose particular experience, qualifications, attributes and skills, when taken together, will allow the Board to ***satisfy its oversight responsibilities effectively*** in light of Bumble's business, structure and risk. As specified in our Corporate Governance Guidelines, in identifying candidates for membership on the Board, the Nominating and Corporate Governance Committee takes into account (1) minimum individual qualifications, such as strength of character, mature judgment, familiarity with Bumble's business and industry, independence of thought and an ability to work collegially with the other members of the Board, and (2) all other factors it considers appropriate, which may include age, diversity of background, existing commitments to other businesses, ***potential conflicts of interest with other pursuits, legal considerations such as antitrust issues***, corporate governance background, various and relevant career experience, relevant technical skills, relevant business or government acumen, financial and accounting background, technology background, compliance background, executive compensation background and the size, composition and combined expertise of the Board.

126.    Regarding the Board's role in risk oversight, the 2022 Proxy Statement stated:

The Board has extensive involvement in the oversight of risk management related to us and our business and accomplishes this oversight through regular reporting by the Audit and Risk Committee. The Audit and Risk Committee represents the Board by ***periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls, our compliance with legal and regulatory requirements*** and our enterprise risk management program. Through its regular meetings with management, including the finance, legal and internal audit functions, the Audit and Risk Committee reviews and discusses all significant areas of our business and summarizes for the Board all areas of risk and the appropriate

mitigating factors.

127.    Regarding how the Board worked with the Audit Committee, the 2022 Proxy Statement disclosed:

> The duties and responsibilities of the Audit and Risk Committee are set forth in its charter … and include assisting the Board of Directors in overseeing the following:
>
> - ***The quality and integrity of our financial statements***, our financial reporting process and our systems of internal accounting and financial controls;
> - ***Our compliance with legal and regulatory requirements***;
> - The independent auditor's qualification, performance and independence;
> - The performance of our internal audit function;
> - The evaluation of risk assessment and risk management issues, particularly with respect to financial risk exposure; and
> - Our technology security and data privacy programs.

128.    These statements were false and misleading as the Board did not effectively maintain and implement adequate risk oversight policies to ensure compliance with legal and regulatory requirements and mitigate the risk of potential conflicts of interest. Further, the Audit Committee did not adequately fulfill its duties in overseeing the integrity of Bumble's financial statements and compliance with legal and regulatory requirements or monitor internal policies to ensure those implemented to provide such oversight were effective.

129.    These statements were additionally false and misleading because the Board did not effectively maintain and implement adequate risk oversight policies to ensure compliance with legal and regulatory requirements and mitigate the risk of potential conflicts of interest. Further, the Audit Committee did not adequately fulfill its duties in overseeing the integrity of Bumble's financial statements and compliance with legal and regulatory requirements or monitor internal policies to ensure those implemented to provide such oversight were effective.

130.    Each of the Director Defendants authorized the filing of the 2022 Proxy Statement with the SEC.

131.     As a result of these false and misleading statements, Director Defendants Mather, Korngold, Morgan, and Thomas-Graham were re-elected to the Bumble Board for an additional three-year term.

## G.     THE BOARD CAUSES THE COMPANY TO REPURCHASE MILLIONS OF DOLLARS-WORTH OF BUMBLE STOCK WHILE THE STOCK PRICE REMAINS AT LEAST PARTIALLY ARTIFICIALLY INFLATED

132.     The full extent of Defendants' wrongdoing, including the Board's involvement in making false and misleading statements in connection with the SPO and the 2022 Proxy Statement, has never been disclosed to the public.

133.     While the Company's stock price has remained at least partially artificially inflated due to this concealed wrongdoing, on May 4, 2023, the Company issued a press release announcing that the Board had approved a share repurchase program of up to $150 million of Bumble's outstanding Class A common stock.

134.     According to the Company's Form 10-Q filed with the SEC on August 9, 2023, during the second quarter of 2023 Bumble repurchased more than 1.3 million shares of its Class A common stock for approximately $20.9 million pursuant to the share repurchase program, a price significantly above the stock's actual value.

## H.     DAMAGES TO THE COMPANY

135.     As noted in the 10-Q filed for 3Q21:

Bumble did not sell any shares of Class A common stock in the offering and did not receive any of the proceeds from the sale. Bumble Inc. paid the costs associated with the sale of shares by the Selling Stockholders, net of the underwriting discounts.

136.     In addition, the Individual Defendants' false and misleading statements have subjected Bumble to costs and expenses incurred in connection with the defense of the Securities Class Action and the settlement thereto of a cash payment of $18 million.

137.    The SPO and false and misleading statements in connection therewith allowed the sale of Blackstone's shares at artificially inflated prices to the detriment of Bumble, whose share price fell precipitously thereafter when the public finally received the information Blackstone knew prior to the SPO.

138.    Moreover, during the second quarter of 2023 while the full extent of Defendants' wrongdoing remained concealed from the public, the Board caused Bumble to repurchase more than 1.3 million shares of its Class A common stock for approximately $20.9 million, a price that was at least partially artificially inflated above the stock's actual value.

139.    The Company was also damaged by paying compensation to the Individual Defendants while they were violating the federal securities laws and/or breaching their fiduciary duties.

140.    Further, as a direct and proximate result of Blackstone's and the Individual Defendants' conduct, Bumble has also suffered and will continue to suffer financial harm and a loss of reputation and goodwill.

## DERIVATIVE & DEMAND FUTILITY ALLEGATIONS

**A.    DERIVATIVE ALLEGATIONS**

141.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

142.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Defendants' breaches of fiduciary duties and other violations of Delaware and federal law.

143.    Plaintiffs are stockholders of Bumble, were stockholders of Bumble at the time of the wrongdoing alleged herein and have been stockholders of Bumble continuously since that time.

144.    Plaintiffs will adequately and fairly represent the interests of the Company and its

stockholders in enforcing and prosecuting its rights.

145.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board of Bumble to institute this action against Blackstone and the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

## B.    DEMAND FUTILITY ALLEGATIONS

146.    At the time of the filing of the original operative complaint in this consolidated action, the Demand Board comprised the following eleven individuals: Director Defendants Herd, Mather, Anderson, Atchison, Bavishi, Bromberg, Griffin, Korngold, Morgan, Steele, and Thomas-Graham.

147.    **All Director Defendants on the Demand Board**: Demand is futile for the eleven Director Defendants who comprise the Demand Board because all face a substantial likelihood of liability for their individual misconduct. Each was a director throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate. Moreover, they had a duty to, in good faith, exercise adequate oversight and supervision to ensure the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure the Board's duties were being discharged in good faith. Instead, they knowingly authorized, caused, and/or failed to correct the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices during the SPO. Each of the Director Defendants also voted to approve the SPO, allowed the use of a conflicted Blackstone affiliate as an underwriter, and signed

the Prospectus and Registration Statements filed with the SEC prior to the SPO. All eleven of the Director Defendants on the Demand Board also authorized the filing of the 2022 Proxy Statement, which contained further false and misleading statements of material fact. All eleven of the Director Defendants on the Demand Board also caused Bumble to repurchase millions of dollars-worth of the Company's stock at a price that was at least partially artificially inflated due to the continued concealment from the public of the full extent of Defendants' wrongdoing. If the Director Defendants were to bring a suit on behalf of Bumble to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Director Defendants.

148.     **Defendant Herd**: Along with the grounds alleged generally for all Director Defendants on the Demand Board, demand is further futile for Defendant Herd because she has a significant relationship with Blackstone by virtue of Blackstone's invitations for her to invest in several high-profile companies that are part of its portfolio. She is clearly a supportive director of Blackstone and cannot act independently or disinterestedly for fear of impeding her ability to participate in future lucrative opportunities with Blackstone. Herd is also bound by the Stockholder's Agreement, which requires her to support the election of Blackstone's designees to the Board and forbids her from removing or replacing them. She is additionally not independent or disinterested because in 2020, she received approximately $19.4 million in executive compensation, a $125 million cash payment from Blackstone when she took over Bumble, and a loan of $119 million that Blackstone caused Bumble to give to her on favorable terms, all of which are amounts material to her. She has long-standing business relationships with other directors, such as Griffin, with whom she invested in Spanx, Inc. on Blackstone's invitation. Herd is also an investor in Griffin's venture "Social Studies." As a majority stockholder with Blackstone, Herd is

further incapable of acting independently or disinterestedly because if she admitted any of the Defendants engaged in the wrongdoing alleged herein, her investments in Bumble would be devalued. Further, alleging the wrongdoing of the other Defendants would result in Herd damaging her own reputation by acknowledging she, as the CEO and Founder of Bumble, knew of the wrongdoing.

149.    **Defendant Mather**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Mather because she is not independent or disinterested by virtue of how she received total compensation from Bumble of $300,000 and $1,319,558 in 2021 and 2022, respectively, amounts material to her. Mather also owns shares of Bumble and is further incapable of acting independently or disinterestedly because if she admitted any of the Defendants engaged in the wrongdoing alleged herein, her investments in Bumble would be devalued. Further, alleging the wrongdoing of the other Defendants would result in Mather damaging her own reputation by acknowledging she, as the Chair of the Board and Chair of the Governance Committee, knew of the wrongdoing.

150.    **Defendant Anderson**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Anderson because she is not independent or disinterested by virtue of how Blackstone not only employs her, but also selected her to be appointed to the Board. She cannot act independently from Blackstone for fear of retribution and termination of her employment. Further, alleging the wrongdoing of the other Defendants would result in Anderson damaging her own reputation by acknowledging she, as a member of the Board, knew of the wrongdoing.

151.    **Defendant Atchison**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Atchinson because she is not independent or disinterested

by virtue of her how she received total compensation from Bumble of $75,000 and $210,607 in 2021 and 2022, respectively, amounts material to her. As Chair of the Audit Committee, she also faces additional liability because she was obligated to review the Company's financial reports to ensure their accuracy and instead failed to ensure the integrity of the Company's financial statements, internal accounting, and financial controls as required by the Audit Committee Charter. Atchinson also owns shares in Bumble and is further incapable of acting independently or disinterestedly because if she admitted any of the Defendants engaged in the wrongdoing alleged herein, her investments in Bumble would be devalued. Further, alleging the wrongdoing of the other Defendants would result in Atchinson damaging her own reputation by acknowledging she, as a member of the Board and Chair of Audit Committee, knew of the wrongdoing.

152. **Defendant Bavishi**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Bavishi because he is not independent or disinterested by virtue of how Blackstone not only employs him, but also selected him to be appointed to the Board. He cannot act independently from Blackstone for fear of retribution and termination of his employment and/or nomination to the Board. Further, alleging the wrongdoing of the other Defendants would result in Bavishi damaging his own reputation by acknowledging he, as a member of the Board, knew of the wrongdoing.

153. **Defendant Bromberg**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Bromberg because he is not independent or disinterested by virtue of how he received total compensation from Bumble of $75,000 and $329,887 in 2021 and 2022, respectively, amounts material to him. As a member of the Audit Committee, he also faces additional liability because he was obligated to review the Company's financial reports to ensure their accuracy and instead failed to ensure the integrity of the Company's financial

statements, internal accounting, and financial controls as required by the Audit Committee Charter. Bromberg also owns shares in Bumble and is further incapable of acting independently or disinterestedly because if he admitted any of the Defendants engaged in the wrongdoing alleged herein, his investments in Bumble would be devalued. Bromberg's livelihood is dependent on Blackstone as his only occupations are being an employee of Blackstone and a Bumble director such that he cannot act independently from Blackstone for fear of retribution and termination of his employment. Further, alleging the wrongdoing of the other Defendants would result in Bromberg damaging his own reputation by acknowledging he, as a member of the Board and the Audit Committee, knew of the wrongdoing.

154.    **Defendant Griffin**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Griffin because she is not independent or disinterested by virtue of how she received total compensation from Bumble of $1,226,002 and $91,947 in 2021 and 2022, respectively, amounts material to her. Griffin also owns shares in Bumble and is further incapable of acting independently or disinterestedly because if she admitted any of the Defendants engaged in the wrongdoing alleged herein, her investments in Bumble would be devalued. Demand is further futile for Griffin because she has a significant relationship with Blackstone, which invited her to invest in several high-profile companies that are part of its portfolio. She cannot act independently or disinterestedly for fear of impeding her ability to participate in future lucrative opportunities with Blackstone. She also has long-standing and intertwined business relationships with Defendant Herd because Herd invested in Griffin's venture "Social Studies." Indeed, in discussing Herd's involvement with Social Studies, Griffin stated that her "mentorship" and "expertise" has been "invaluable." Griffin further leaned into the relationship with Herd in a March 5, 2019 article posted on the Social Studies website titled "Women Leading the Charge" which

praised Herd as was one of "a select few women we admire who are launching and scaling female-forward businesses spanning politics, the economy and culture" and one "of the most influential ladies we know to follow for inspiration."    Herd also attended and spoke at the G9 Ventures Summer Summit held on July 28, 2023, a female entrepreneur-focused conference and networking event thrown by Griffin. Most notably, Griffin demonstrated that she is a devoted friend of Herd by posting a photo on her personal Instagram page on July 5, 2023 of her posing with Herd in matching outfits, and writing in the caption: "There is only ONE @whitney To watch you navigate the beautiful life you've created as a mother, friend, CEO and someone who has unapologetically moved the needle for women around the world is an honor. You are a mentor, an inspiration and a bold thinker. Happy birthday WWH! Can we please twin more often!" Finally, alleging the wrongdoing of the other Defendants would result in Griffin damaging her own reputation by acknowledging she, as a member of the Board, knew of the wrongdoing.

155. **Defendant Korngold**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Korngold because he is not independent or disinterested by virtue of how Blackstone not only employs him, but also selected him to be appointed to the Board. He cannot act independently from Blackstone for fear of retribution and termination of his employment and/or nomination to the Board. Further, alleging the wrongdoing of the other Defendants would result in Korngold damaging his own reputation by acknowledging he, as a member of the Board, knew of the wrongdoing.

156. **Defendant Morgan**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Morgan because she is not independent or disinterested by virtue of how Blackstone not only employs her, but also selected her to be appointed to the Board. She cannot act independently from Blackstone for fear of retribution and termination of her

employment and/or nomination to the Board. As a member of the Governance Committee, she also faces additional liability because she was obligated to ensure the implementation and effectiveness of the policies contained in the Company's governing documents and instead failed to ensure the integrity of the Company's governance as required by the Corporate Governance Guidelines. Further, alleging the wrongdoing of the other Defendants would result in Morgan damaging her own reputation by acknowledging she, as a member of the Board and the Governance Committee, knew of the wrongdoing.

157.    **Defendant Steele**: Along with the grounds alleged generally for all Director Defendants, demand is further futile for Steele because she is not independent or disinterested by virtue of how she received total compensation from Bumble of $75,000 and $329,887 in 2021 and 2022, respectively, amounts material to her. Steele also owns shares in Bumble and is further incapable of acting independently or disinterestedly because if she admitted any of the Defendants engaged in the wrongdoing alleged herein, her investments in Bumble would be devalued. As a member of the Governance Committee, she also faces additional liability because she was obligated to ensure the implementation and effectiveness of the policies contained in the Company's governing documents and instead failed to ensure the integrity of the Company's governance as required by the Corporate Governance Guidelines. As a member of the Audit Committee, she also faces additional liability because she was obligated to review the Company's financial reports to ensure their accuracy and instead failed to ensure the integrity of the Company's financial statements, internal accounting, and financial controls as required by the Audit Committee Charter. Further, alleging the wrongdoing of the other Defendants would result in Steele damaging her own reputation by acknowledging she, as a member of the Board and its Governance and Audit Committees, knew of the wrongdoing.

158.    **Defendant Thomas-Graham**:  Along with the grounds alleged generally for all Director Defendants, demand is further futile for Thomas-Graham because she is not independent or disinterested by virtue of how she received total compensation from Bumble of $75,000 and $306,965 in 2021 and 2022, respectively, amounts material to her. Thomas-Graham also owns shares in Bumble and is further incapable of acting independently or disinterestedly because if she admitted any of the Defendants engaged in the wrongdoing alleged herein, her investments in Bumble would be devalued. As a member of the Audit Committee, she also faces additional liability because she was obligated to review the Company's annual and quarterly reports to ensure their accuracy and instead failed to ensure the integrity of the Company's financial statements and internal accounting and financial controls as required by the Audit Committee Charter. Further, alleging the wrongdoing of the other Defendants would result in Thomas-Graham damaging her own reputation by acknowledging she, as a member of the Board and its Audit Committee, knew of the wrongdoing.

159.    In light of the forgoing, demand on the Demand Board to investigate, initiate, or prosecute the claims alleged herein is futile.

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against the Individual Defendants and Blackstone)

160.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

161.    The Individual Defendants owed and presently owe Bumble fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and presently owe Bumble the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

162.    Defendants Blackstone and Herd further owed fiduciary duties to Bumble as its

controlling stockholders.

163.    All of the Individual Defendants and Blackstone violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

164.    Each of the Individual Defendants and Bumble had actual knowledge which caused them to violate their duty of good faith. Namely, each knowingly caused and allowed the Company to make false and misleading statements and/or omissions regarding Bumble's growth trends prior to the SPO and forecasted thereafter. As a result, the Individual Defendants and Blackstone caused the Company's SEC filings to be materially false and misleading at all relevant times.

165.    The Individual Defendants further failed to supervise, exert internal controls over, and consciously disregarded responsibilities involving the Company.

166.    As a direct and proximate result of the Individual Defendants' and Blackstone's breach of their fiduciary obligations, Bumble has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Blackstone are liable to the Company.

167.    Plaintiffs, on behalf of Bumble, have no adequate remedy at law.

## COUNT II

**Breach of Fiduciary Duty for Insider Trading (*Brophy*)**
**(Derivatively Against Defendant Blackstone)**

168.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

169.    Blackstone had knowledge that the Company's public statements about its business, operations, and prospects were false and misleading. Yet, Blackstone nonetheless made or failed to correct numerous materially false and misleading statements and omissions regarding the Company's business prospects, and then profited handsomely by selling its shares of Bumble's common units at a time the public was in the dark.

170.    Once the truth about Bumble's lack of growth became known, the price of the Company's common units plummeted.

171.    The truth about Bumble's growth represents material, nonpublic information Blackstone used to force Bumble to call the SPO so Blackstone could sell its common units during the SPO.

172.    The material, nonpublic information at issue was proprietary information, which Blackstone used for its own benefit when it sold its common units of Bumble.

173.    Since the use of the Company's proprietary information for Blackstone's gain constitutes a disloyal act in breach of its fiduciary duties, Plaintiffs, as stockholders of Bumble and on its behalf, seek restitution from Blackstone and an order of this Court imposing a constructive trust and disgorging all profits, benefits, and other compensation obtained by it as a result of its wrongful conduct and fiduciary breaches.

174.    Plaintiffs, on behalf of Bumble, have no adequate remedy at law.

## **COUNT III**

### **Violation of Section 14(a) of the Exchange Act**
### **(Derivatively Against the Director Defendants)**

175.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

176.    This claim is brought derivatively on Bumble's behalf for the Director Defendants' violations of Section 14(a) of the Exchange Act and Rule14a-9 promulgated thereunder.

177.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

178.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

179.    The 2022 Proxy Statement stated the Board had put forth Board nominees Mather, Korngold, Morgan, and Thomas-Graham. The Board—after considering factors such as each nominee's "potential conflict of interests" and "legal considerations" and the Board's responsibility in overseeing the "quality and integrity of our financial statements" and Bumble's "compliance with legal and regulatory requirements"—allegedly concluded such nominees would allow the Board to "satisfy its oversight responsibilities effectively." For nominees such as Thomas-Graham, who was on the Audit Committee, the 2022 Proxy Statement stated those considerations were key because the Audit Committee assisted the Board in its oversight responsibilities by "periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls, our compliance with legal and regulatory requirements."

180.    The 2022 Proxy Statement was false and misleading and omitted material information because all Director Defendants, including the four being renominated for appointment, had in fact consciously disregarded the Board's oversight responsibilities with respect to the accuracy of Bumble's financial reporting by authorizing the filing of materially

misleading materials with the SEC prior to the SPO. Those filings had concealed and misrepresented the Company's growth, performance, and expected 3Q21 and future results for the purpose of allowing Blackstone, the Company's majority stockholder, to utilize non-public confidential information to offload its own shares on the unsuspecting public at inflated prices while the Company's paid all the costs thereof.

181.    Further, the 2022 Proxy Statement mispresented or failed to disclose material deficiencies and lack of effective oversight in Bumble's risk management and internal controls that were known to the Director Defendants when it was filed.

182.    Further, 2022 Proxy Statement was false and misleading and omitted material information because all Director Defendants—including nominees Mather, Korngold, Morgan, and Thomas-Graham—each had "legal considerations" by virtue of being named as defendants in the Securities Class Action, which was filed months prior.

183.    The Director Defendants had actual knowledge that the 2022 Proxy Statement contained misleading information and/or omitted material information.

184.    The misrepresentations and omissions in the 2022 Proxy Statement were material to Company stockholders in voting on the 2022 Proxy Statement and the reelection of Director Defendants Mather, Korngold, Morgan, and Thomas-Graham.

185.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

186.    Plaintiffs, on behalf of Bumble, have no adequate remedy at law.

## COUNT IV

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
(Derivatively Against the Individual Defendants and Blackstone)**

187.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if

fully set forth herein.

188.    During the relevant period, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employing a device, scheme, or artifice to defraud, the Individual Defendants and Blackstone made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and its stockholders in connection with the Company's repurchase of its own shares during the relevant period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

189.    These false and misleading statements, and material omissions, at least partially artificially inflated the price of the Company's common stock.

190.    While the price of the Company's common stock was at least partially inflated, the Individual Defendants and Blackstone caused the Company to repurchase shares of its common stock.

191.    The Company would not have purchased its common stock at the prices it paid had the market been aware that the market price of was at least partially artificially and falsely inflated by the Individual Defendants' and Blackstone's misleading statements and omissions. As a direct and proximate result of the Individual Defendants' and Blackstone's wrongful conduct, the Company suffered damages in connection with its purchases of Company common stock during the relevant period. By reason of such conduct, the Individual Defendants and Blackstone are liable to the Company.

192.    Plaintiffs, on behalf of Bumble, have no adequate remedy at law.

## COUNT V

**Rescission of Contract Pursuant to Section 29(b) of the Exchange Act
(Derivatively Against the Individual Defendants)**

193.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

194.    As a result of their conduct, as alleged herein, the Individual Defendants violated Sections 10(b) and 14(a) of the Exchange Act during the time they entered into contracts with the Company regarding their compensation.

195.    According to the Company's most recent proxy statement: "***All incentive awards*** made pursuant to the Bumble Inc. 2021 Omnibus Incentive Plan … ***are subject to reduction, cancellation, forfeiture or recoupment*** to the extent necessary to comply with (i) any clawback, forfeiture or other similar policy adopted by the Board or the Compensation Committee and as in effect from time to time; and (ii) applicable law."  Further, "unless otherwise determined by the Compensation Committee, to the extent that the executive receives ***any*** amount in excess of the amount that the executive should otherwise have received under the terms of the incentive award ***for any reason*** …, the executive will be required to repay any such excess amount to the Company."

196.    If the Company attempts to claw back compensation from the Individual Defendants, the Individual Defendants might assert a breach of contract claim.

197.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

198.    The Individual Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into

with the Company.

199.    The Company was and is an innocent party with respect to the Individual Defendants' Exchange Act violations.

200.    Plaintiffs, on behalf of the Company, seek rescission of the contracts between the Individual Defendants and the Company and claw back of the compensation and incentives paid to the Individual Defendants due to the Individual Defendants' violations of the Exchange Act while performing their job duties.

201.    Even if the contracts are not rescinded by the Court as a result of the Individual Defendants' Exchange Act violations, the Court can and should award equitable remedies in the form of injunctive relief barring the Individual Defendants from asserting breach of contract by the Company in any action by Plaintiffs on behalf of the Company to claw back compensation from the Individual Defendants.

202.    Plaintiffs seek only declaratory, injunctive, and equitable relief in this claim.

## COUNT VI

### Corporate Waste
### (Derivatively Against the Individual Defendants and Blackstone)

203.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

204.    The Individual Defendants, while intending *only* Blackstone to profit from the SPO, nevertheless caused or approved Bumble to pay all costs associated with the SPO, including $33.5 million in underwriting fees, a portion of which was paid to Blackstone's affiliate.

205.    Further, the Individual Defendants and Blackstone caused Bumble to repurchase millions of dollars-worth of the Company's stock a price that remained at least partially artificially inflated.

206.    As a result, the Company was caused to waste its assets.

207.    The exchange of the Company's assets for no benefit to Bumble in both the SPO and the stock repurchases, accordingly, was so one-sided no person of ordinary, sound business judgment could conclude Bumble received adequate consideration.

208.    The Individual Defendants and Blackstone are liable to the Company for the amount of corporate assets thus wasted by them.

209.    Plaintiffs, on behalf of Bumble, have no adequate remedy at law.

## COUNT VII

### Unjust Enrichment
### (Derivatively Against Defendant Blackstone)

210.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

211.    Bumble's SPO provided benefits to Blackstone because Bumble paid its conflicted affiliate underwriting and, in the SPO, sold *only* Blackstone's common units. The SPO is thereby the product of breaches of fiduciary duty by Blackstone and unfair to the Company and its minority stockholders.

212.    Blackstone, by unlawful means, directly benefited and continues to directly benefit from the SPO, especially as Bumble common units continue to trade far below the price Blackstone sold its own common units during the SPO.

213.    Under these circumstances, it would be unconscionable for Blackstone to retain the benefits it improperly received.

214.    Plaintiffs, on behalf of Bumble, have no adequate remedy at law.

## COUNT VIII

### Unjust Enrichment
### (Derivatively Against Individual Defendants)

215.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

216.    Each Individual Defendant benefitted from the wrongful conduct alleged herein by receiving bonuses, stock options, or other compensation from Bumble.

217.    Such benefits were tied to the Individual Defendants' performance and/or the inflated value of the Company's shares prior to the SPO.

218.    Such benefits and compensation were thereby unjust in light of the Individual Defendants' wrongful conduct and the actual performance of the Company.

219.    Under these circumstances, it would be unconscionable for the Individual Defendants to retain the benefits they improperly received.

220.    Plaintiffs, on behalf of Bumble, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Declaring Plaintiffs may maintain this derivative action on behalf of Bumble and Plaintiffs are proper and adequate representatives of the Company;

B.    Directing the Defendants, jointly and severally, to account for all losses and damages sustained by Bumble caused by the acts and omissions complained of herein;

C.    Awarding Bumble money damages against the Defendants for all losses and damages sustained by Bumble and its stockholders as a result of Defendants' wrongful acts;

D.    Rescinding the Individual Defendants employment agreements with the Company;

E.      Directing each Defendant to account for, remit, and disgorge all profits and other benefits improperly received and retained pursuant to each Defendant's wrongdoing and imposing a constructive trust thereon;

F.      Ordering Bumble to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

G.      Awarding Bumble pre-judgment interest and post-judgment interest as allowed by law;

H.      Awarding Bumble punitive damages;

I.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

J.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 28, 2023

**CO-LEAD COUNSEL**

Michael J. Hynes
Ligaya T. Hernandez
**HYNES & HERNANDEZ, LLC**

*/s/ Thomas A. Uebler*
Thomas A. Uebler (#5074)
Terisa A. Shoremount (#7113)
**MCCOLLOM    D'EMILIO    SMITH**
**UEBLER LLC**
Little Falls Centre Two

101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Email: mhynes@hh-lawfirm.com
         lhernandez@hh-lawfirm.com

Melinda A. Nicholson
Nicolas Kravitz (#6107)
Jenn Tetreault
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 648-1842
Email: melinda.nicholson@ksfcounsel.com
         nicolas.kravitz@ksfcounsel.com
         jenn.tetreault@ksfcounsel.com

*Co-Lead Counsel for Plaintiffs*

2752 Centerville Road, Suite 401
Wilmington, DE 19808
Telephone: (302) 469-5960
Email: tuebler@mdsulaw.com
         tshoremount@mdsulaw.com

*Liaison Counsel for Plaintiffs*

Brian D. Long (#4347)
**LONG LAW, LLC**
3828 Kennett Pike, Suite 208
Wilmington, DE 19807
Telephone: (302) 729-9100
Email: bdlong@longlawde.com

*Additional Liaison Counsel for Plaintiff
Marilee Glover-Mott*

Melissa A. Fortunato
Marion C. Passmore
**BRAGAR EAGEL & SQUIRE, P.C.**
810 Seventh Avenue, Suite 620
New York, NY 100019
Telephone: (212) 308-1869
Email: fortunato@bespc.com
         passmore@bespc.com

*Additional Counsel for Plaintiff Marilee C.
Glover-Mott*